**OFFICE OF THE STATE COURT ADMINISTRATOR, Colorado Judicial Department; and Steven V. Berson, State Court Administrator, Petitioners,**

v.

**BACKGROUND INFORMATION SERVICES, INC.,**
**Respondent.**

No. 99SC381.

Supreme Court of Colorado,
En Banc.

Nov. 22, 1999.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McClachlan, Solicitor General, Maurice G. Knaizer, Deputy Attorney General, State Services Section, Denver, Colorado, Attorneys for Petitioners.

Pendleton, Friedberg, Wilson & Hennessey, P.C., F. Stephen Collins, Joel W. Cantrick, Denver, Colorado, Attorneys for Respondent.

Justice KOURLIS delivered the Opinion of the Court.

This case concerns a request for release of computer-generated bulk data containing very particularized information about individuals who are parties to criminal or civil cases in the State of Colorado. We conclude that the General Assembly has not evidenced its intent that this data should be unqualifiedly available to the public in bulk form, and absent such intent, the administrative policies of the supreme court control its release. Specifically, we conclude that the General Assembly has enacted various specific statutes that control the release of court record information and has afforded to the courts themselves control over release of the remaining information, pursuant to court order or rule. A Chief Justice Directive operates as such a court order or rule, and therefore, Chief Justice Directive 98–05 permitted the State Court Administrator to deny a request for release of bulk electronic data stored by the Judicial Branch.

## I.

The Colorado Judicial Branch is a separate branch of Colorado state government, responsible for the exercise of judicial power and administration of the court system. See Colo. Const. art. VI, § 1. The State Court Administrator (the SCA) is an appointee of the supreme court who administers the judicial system on a day-to-day basis. See Colo. Const. art. VI § 5(3); § 13–3–101(1), 5 C.R.S. (1999). The county courts, district courts, Denver juvenile court, Denver probate court, court of appeals, and supreme court are courts of record within the state. See § 13–1–111, 5 C.R.S. (1999). Accordingly, the clerks of those courts must keep official records of the title and case number references to the various orders, rulings, judgments, papers, and other proceedings of

the court in each case (registries of actions). *See* § 13–1–102, 5 C.R.S. (1999).

In 1978, the Colorado Judicial Branch began storing case records in the electronic Colorado Court System database (the CCS). The CCS contained approximately seventy percent of all Colorado court filings.

In early 1992, Background Information Systems, Inc. (BIS) requested access to the magnetic tapes containing court record information generated through the CCS. The SCA agreed to the request, and at BIS's expense, the SCA created customized new tapes that deleted statutorily confidential information from the bulk of the data. The SCA updated the tapes on a regular basis with new court information.

Beginning in early 1993 and continuing through late 1995, the state converted from the General Government Computer Center database to the Colorado Judicial Information Management System (the CJIMS), a decentralized system operated internally. By May of 1995, 100% of Colorado's court filings were recorded on the CJIMS database. Again, at BIS's request and expense, the SCA created a computerized segregation program to prevent disclosure of statutorily confidential information (such as the names of victims in sexual assault cases), and then released the balance of the information to BIS.

In 1994, the SCA began its conversion to the Integrated Colorado On–Line Network (ICON). ICON was intended to eliminate redundant data collection, establish a single database for participation in the Colorado Integrated Criminal Justice Information System (CICJIS), and improve functioning in court processing, probation case processing, and financial processing. The new CICJIS is a system mandated by the legislature to maximize the sharing and standardization of data and communications technology among law enforcement agencies, district attorneys, the courts, and corrections. *See* § 16–20.5–102(3), 6 C.R.S. (1999). CICJIS substantially relied on ICON for its operation, and was scheduled to be fully operational statewide by January 1998.

BIS used the magnetic tapes to create a searchable statewide database of Colorado civil and criminal justice records. BIS then sold data from this system to various customers, including businesses and state and local governments. According to BIS, these entities used the information to perform background checks on prospective employees.

In the fall of 1995, the SCA expressed concern that BIS was receiving confidential and inaccurate information through the database.[1] As a result, the SCA and BIS attempted to modify the program in an effort to address the problems. In August of 1997, the SCA decided to cease delivery of the tapes to BIS.[2] At that time, the SCA still produced the magnetic tapes from the CJIMS database.

During the period when the SCA was releasing the extracted CJIMS tapes to BIS, the tapes included broad civil and criminal case information, such as judgment debtor and creditor information, domestic case filings information, and in some instances, criminal defendants' and civil litigants' social security numbers and drivers license numbers.

On August 29, 1997, BIS applied to the district court pursuant to section 24–72–204(5), 7 C.R.S. (1999) of the Public Records Act for an order directing the SCA to show cause why it should not be required to create and release an electronic database purged of statutorily confidential information. BIS asserted that the Public Records Act imposes upon the courts an implied duty to create such a record at the expense of those desiring it. The district court ruled in favor of

---

1. The SCA mentioned two specific concerns. First, the SCA noted that trial courts could seal records in criminal files after the information had already been delivered to BIS on tape, thereby creating a circumstance wherein BIS would have information that the court had sealed. Second, the SCA learned that some trial court minute orders contained sexual assault victims' names. Hence, release of those minute orders to BIS in the database violated statutory proscriptions. *See* § 24–72–304(4)(a), 7 C.R.S. (1999).

2. Some deliveries occurred thereafter by operation of court order.

BIS and ordered the SCA to provide the database.[3]

The SCA appealed to the Colorado Court of Appeals, but prior to that court's review of the case, on October 2, 1998, Chief Justice Mary J. Mullarkey issued Chief Justice Directive 98–05 (CJD 98–05). CJD 98–05 established a Public Access Committee and directed as follows:

The SCA[O], as the official custodian of the electronic database, is charged with completing the following requests for information from the ICON system, consistent with the policies and procedures developed by the public access committee.

1. **Bulk Requests.** Requests for bulk data shall be considered those requests for information from the entire statewide trial court ICON database. The public access committee shall determine the policies and procedures for the release of bulk data pursuant to the following guidelines:

a. The release of such information shall not interfere with the regular discharge of the duties of the courts, probation or the state court administrator's office.

b. Information shall not be released if contrary to the public interest.

Until such time as the committee develops such procedures the custodian of the record may only release bulk data in the form in which the data is currently maintained if the release does not interfere with the duties of the courts, probation or the state court administrator's office; and if the data is accurate and complies with confidentiality requirements.

On December 10, 1998, the court of appeals affirmed the decision of the district court. *See Background Info. Servs., Inc. v. Office of the State Court Adm'r,* 980 P.2d 991, 992 (Colo.App.1998). That court held that the Colorado Public Records Act applied to the courts and imposed an implied duty on the custodian of court records to create a new record consisting only of information that was not statutorily confidential. *See id.* at 994, 996.

Four days later, on December 14, 1998, the Public Access Committee issued Public Access Policy 98–01. It prohibits the release of bulk data to individuals, government agencies, or private entities. The committee reasoned:

This policy is adopted in the best interests of the public for the following reasons:

● Bulk data, as regularly maintained by the Judicial Branch in the normal course of business, includes information that is protected from disclosure by law. In order to protect confidential information, the bulk data must be manipulated to generate a record in a form that is not used by the Judicial Branch. Thus, release of bulk data is inconsistent with Chief Justice Directive 98–05. Further, the subset of the entire database that remains after the extraction of all data that is confidential is not maintained for the purposes of the operation of the Judicial Branch.

● The rights of litigants and other parties to court actions may be jeopardized by the wholesale release of information.

● Incomplete and inaccurate data are likely to be resident in the complete set of ICON data and cannot be evaluated under this type of release.

● Release of bulk data does not allow for any review of the data or the issues that may arise if disseminated without such review.

Following a petition for rehearing, the court of appeals modified its opinion to address the SCA's concern about the privacy interests inherent in the court records. The court of appeals concluded that the strong presumption favoring access to public information outweighed any invasion of privacy. *See Background Info. Servs.,* 980 P.2d at 993. It further held that CJD 98–05 did not constitute a rule of the supreme court or an order of any court, as contemplated by section 24–72–204(1)(c), because Chief Justice

---

**3.** On September 19, 1997, the district court denied the SCA's Motion for Stay of the execution and enforcement of the order, and deliveries proceeded accordingly.

Mullarkey acted alone in adopting CJD 98–05 without the express concurrence of at least two other members of the supreme court. *See id.* at 995–96.

Shortly thereafter, on February 23, 1999, the supreme court promulgated Rule Change # 1999(3) (the Rule). The Rule reads as follows:

The purpose of this rule is to provide the public with reasonable access to Judicial Branch documents and information while protecting the privacy interests of parties and persons. In addition, this rule is intended to provide direction to Judicial Branch personnel in responding to public records requests.

The Chief Justice is authorized to issue directives regarding access of the public to documents and materials made, received, or maintained by the courts. Such Directives of the Chief Justice are orders of the Supreme Court and shall govern release of records to the public. The Chief Justice on behalf of the Supreme Court is authorized, in the implementation of this rule, to appoint committees and assign custodians of records, and to designate the functions of such committees and custodians of records, as the Chief Justice may determine.

The Chief Justice has issued CJD 98–05, which is authorized pursuant to this rule without further action. Pursuant to CJD 98–05, the Chief Justice has appointed a Public Access Committee to adopt policy. The policy of that Committee is effective without further action. Because policy concerning public access to information is in development stages, as are components of the ICON system, the policy of any duly authorized committee appointed by the Chief Justice is effective when adopted. This rule is adopted by the Court on an interim basis, pending a final proposal by the Public Access Committee, public comment thereon, and further action by the court.

Custodians of records within the judicial branch are not authorized to release any records or material to the public inconsistent with this rule or Chief Justice Directives. This rule is intended to be a rule of the Supreme Court within the meaning of the Colorado Public Records Act, including sections 24–72–204(1)(c) and 24–72–305(1)(b) (7 C.R.S.).

After the court of appeals denied the SCA's second petition for rehearing, the SCA moved for a stay of the court of appeals' judgment,[4] and petitioned this court for a writ of certiorari. We granted certiorari to consider three issues arising out of the cessation of the SCA's delivery of magnetic tapes containing Colorado court filings to BIS.

The issues are:

Whether, pursuant to sections 24–72–204(1)(c) and 24–72–305(1)(b), 7 C.R.S. (1999), Rule Change # 1999(3) adopted by this Court on February 23, 1999, is a rule or order that exempts the State Court Administrator from the inspection and disclosure requirements of the Public Records Act;

Whether, pursuant to sections 24–72–204(1)(c) and 24–72–305(1)(b), Chief Justice Directive 98–05, amended October 2, 1998, is a rule or order of the Court permitting the State Court Administrator to deny a request for inspection, disclosure or transfer of bulk electronic information kept by the Judicial Branch; and

Whether the Public Records Act, sections 24–72–101 to –206, 7 C.R.S. (1999), and sections 24–72–301 to –309, 7 C.R.S. (1999), mandates that a custodian of records manipulate a record or electronic data that contains both confidential and nonconfidential information, in order to create another version of the record or electronic data not ordinarily used by the department or agency, in response to a request for inspection or disclosure of records.

## II.

Before we reach the merits of the issues, we first address BIS's contention that this court is disqualified from hearing the case because of its supervision over the SCA and its involvement in adoption of CJD 98–05 and the Rule.

4. The supreme court granted the SCA's Motion for Stay of Judgment on May 17, 1999.

The records we here address are records of the court system, and this court has ultimate administrative responsibility over that system. *See* Colo. Const. art. VI, § 2. The data collection and the development of policy have proceeded under the auspices of that authority. In other circumstances, such an intrinsic involvement would create an irreconcilable conflict of interest.

However, there is a problem—one that has arisen in the court system for centuries. If this court were to disqualify itself, there would be no other court to which the litigants could turn for a final answer. If this court were not to render judgment, no other tribunal would be available to do so.

■ Because of this reality, the common law rule of necessity came into being. Its first recorded use was in the year 1430. *See United States v. Will,* 449 U.S. 200, 213, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980). The rule of necessity provides that it may become necessary for a judge to hear a case in which she has an interest where no one else can take her place. *See id.*

The United States Supreme Court recognized the rule of necessity as recently as 1980 in *Will,* calling it an "ancient Rule" that has been "consistently applied in this country in both state and federal courts." 449 U.S. at 214–17, 101 S.Ct. 471. We adopted the rule of necessity in Colorado many years ago and implement it here. *See, e.g., In re Title, Ballot Title & Submission Clause & Summary for 1997–1998 # 64,* 960 P.2d 1192, 1197 n. 12 (Colo.1998); *deKoevend v. Board of Educ.,* 688 P.2d 219, 229 n. 6 (Colo.1984) (citing United States Supreme Court cases invoking the rule of necessity).

■ In the case currently before the court, the court could have declined certiorari on the pending issues. Certiorari is not a matter of right. However, the court has announced its intent to grant certiorari on important cases. *See* C.A.R. 49(a) (1999). Were the court to have declined certiorari due to the inherent conflict, despite a concern that the court of appeals had rendered an important decision and had interpreted the law in a way not in accord with this court's understanding, this court would have

abrogated its responsibility as the court of final resort in the state.

■ The rule of necessity requires judges to resolve a case when there is no other court with jurisdiction and responsibility where the litigants may seek finality. This is such a case, and the rule of necessity requires us to proceed. Accordingly, we turn to the merits of the case.

### III.

■ This case has been framed by the parties as one arising under the Colorado Public Records Act, beginning at section 24–72–201. As a threshold matter, we first conclude that the courts are not agencies for all purposes under that Act.

The General Assembly has declared that "[i]t is ... the public policy of this state that all public records shall be open for inspection by any person at reasonable times, except as provided in this part 2 or as otherwise specifically provided by law." § 24–72–201, 7 C.R.S. (1999). "Public records" are defined as "all writings made, maintained, or kept by the state, any agency, institution, or political subdivision of the state." § 24–72–202(6)(a)(I), 7 C.R.S. (1999). The question is whether the General Assembly intended the courts to be treated as state agencies for all purposes under the Public Records Act.

### A.

There is no doubt that the General Assembly intends the courts to make certain criminal records available to the public. The Criminal Justice Records Act, a part of the Public Records Act that was adopted at a different time, addresses the maintenance, accuracy, completeness, and dissemination of criminal justice records. Under that Act, courts are specifically identified as a criminal justice agency responsible for maintaining certain records, and for assuring that they are open for inspection. *See* §§ 24–72–302(3), –303, 7 C.R.S. (1999).

The Criminal Justice Records Act creates two categories of records: records of official action and criminal justice records. The Criminal Justice Records Act defines an offi-

cial action as "an arrest; indictment; charging by information; disposition; pretrial or posttrial release from custody; judicial determination of mental or physical condition; decision to grant, order, or terminate probation, parole, or participation in correctional or rehabilitative programs; and any decision to formally discipline, reclassify, or relocate any person under criminal sentence." § 24–72–302(7). The records of official action "shall be open for inspection by any person at reasonable times, except as provided in this part 3 or as otherwise provided by law." § 24–72–303(1).

Except for records of official actions, which *must* be available for inspection, all other criminal justice records, at the discretion of the official custodian, *may* be open for inspection by any person at reasonable times, except as otherwise provided by law. *See* § 24–72–304(1), 7 C.R.S. (1999). The custodian is authorized to make such rules and regulations as are reasonably necessary for the protection of the records and the prevention of unnecessary interference with the regular discharge of duties. *See id.* Additionally, one basis for denial of a request for inspection by the custodian is that the inspection "is prohibited by rules promulgated by the supreme court or by the order of any court." § 24–72–305(1)(b).

The Criminal Justice Records Act also creates particularized access to criminal history records for public or private nonprofit, not-for-profit or volunteer organizations, and for licensing entities. *See* §§ 24–72–305.3, –305.4, 7 C.R.S. (1999).

■ Further, the Integrated Criminal Justice Information System Act provides that the courts are a "criminal justice agency" responsible for developing a database and sharing information with the department of public safety, the department of corrections, the department of human services, and the Colorado district attorneys council. *See*

§§ 16–20.5–101.5 [5] to –103, 6 C.R.S. (1999). That Act also references an intent that the integrated system will facilitate "[a]ccess to timely, accurate, and complete information by both staff from all criminal justice agencies and the public when permitted by article 72 of title 24, C.R.S." § 16–20.5–101.5.

■ Hence, the General Assembly has clearly made certain portions of criminal case files available to the public, has reserved to the official custodian discretion as to other portions of criminal case files, and has barred the release of other portions.[6]

### B.

We turn now to the balance of court records, which include divorce filings, general civil case filings, probate, mental health, juvenile, dependency and neglect, and water case filings. It is not at all clear to us that the General Assembly intended these records to fall within the purview of "public records" under the Public Records Act.

First, we note that certain of those records are covered by specific statutes that address the competing interests between disclosure and confidentiality. One example is Part 3 of the Colorado Children's Code, which creates a comprehensive blueprint for the exchange of information between state agencies and the judicial department, and which limits the release of certain information to the public concerning dependency and neglect and delinquency proceedings. The General Assembly declared:

> [t]he disclosure of sensitive information carries the risk of stigmatizing children; however, absolute confidentiality of such information results in duplicated services in some cases, fragmented services in others, and ineffective and costly programs. In addition, disclosure may result in serving the best interests of the child and may be in the public interest such as where a

---

5. In 1998, the General Assembly added a specific reference in the Integrated Criminal Justice Information System Act to the Public Records Act and Criminal Justice Records Act. Specifically, the statutory language, "when permitted by article 72 of title 24, C.R.S.," was added by Ch. 250, sec. 1, § 16–20.5–101.5, 1998 Colo. Sess. Laws 941, 942. The intent of the addition seems to be

to clarify that the Integrated Criminal Justice Information System Act does not itself create or restrict public access rights.

6. For example, the names of sexual assault victims must be deleted from records prior to public inspection. *See* § 24–72–304(4)(a).

juvenile has committed an act that would be a crime of violence if committed by an adult. Therefore, in an effort to balance the best interests of children and the privacy interests of children and their families with the need to share information among service agencies and the need to protect the public safety, the general assembly enacts the provisions of this part 3.

§ 19–1–302, 6 C.R.S. (1999).

Another example of the General Assembly's particularized attention to the manner in which court records are to be held and released, or not released, appears in the mental health provisions of section 27–10–107(7), 8 C.R.S. (1999), directing clerks of court to maintain mental health case files separate from other case files, and to seal them and omit the name of the respondent from the index of cases under certain circumstances. § 27–10–107(7).

Beyond those specific mandates, there are two general pronouncements by the General Assembly relating to court records. The first is a very limited requirement that courts of record shall maintain a registry of actions and a judgment record, and shall provide that they be open to the public for inspection. *See* §§ 13–1–101, –102, –119, 5 C.R.S. (1999). The registry of actions consists of the title of each cause or matter, and the case number references to the various orders, rulings, judgments, papers, or other proceedings of the court in that case. *See* § 13–1–102.

The second general legislative statement operates to preclude the very access that BIS seeks, and further operates to cast doubt on the general application of the Public Records Act to the courts. Section 30–10–101 provides:

Every sheriff, county clerk and recorder, county treasurer, and clerk of the district and county courts shall keep his or her respective office at the county seat of the county and in the office provided by the county, if any such has been provided, or, if there is none provided, then at such place as the board of county commissioner shall direct. Subject to the provisions of part 2 of article 72 of title 24, C.R.S., and

any judicially recognized right of privacy, all books and papers required to be in such offices shall be open to examination of any person, but *no person, except parties in interest, or their attorneys, shall have the right to examine pleadings or other papers filed in any cause pending in such court.* § 30–10–101(1)(a), 9 C.R.S. (1999) (emphasis added).

In *Times–Call Publishing Co. v. Wingfield,* 159 Colo. 172, 410 P.2d 511 (1966), the publishing company challenged the constitutionality of section 30–10–101(1)(a) [7] in part on the grounds that it violated guarantees of freedom of the press by precluding press access to court proceedings. We concluded that the constitutional interpretation of the statute was that judges and clerks of record are not "prohibited from allowing persons other than parties in interest or their attorneys to examine the pleadings or other papers on file in such courts." *Id.* at 177, 410 P.2d at 513. We further held that in a matter of public interest such as an election contest case, it would be an abuse of discretion for the court to deny a publishing company access to the court file. *See id.* at 177–78, 410 P.2d at 514.

The General Assembly was not unaware of the existence of the statute when it enacted the Public Records Act. An interim committee conducted a study that resulted in a Research Publication in 1967. *See* Colorado Legislative Council, *Report to the Colorado General Assembly: Open Public Records for Colorado,* Research Publication No. 126, pp. 47–48 (November 1967). That report included a review of access to court records, which noted that "[b]y statute, no person, except parties in interest or their attorneys, has the right to examine pleadings or other papers filed in any cause pending in district or county court." *Id.* at 47 (citation omitted). The report referred to *Times–Call* and further noted that the supreme court and the Judicial Administrator were "concerned over the possible damage to litigants and defendants if court records were subjected to indiscriminate perusal by curious members of the public who have no legitimate reason for making such examination." *Id.* at 47–48.

---

7. The 1966 version of the statute can be found at § 35–1–1(1), 3 C.R.S. (1963).

In the face of that report, the General Assembly neither repealed the pertinent language in section 30–10–101, nor did it define the courts as an agency of the state for purposes of the Public Records Act.

In sum, we conclude that access to court-maintained files involves a fragile balance between the interests of the public and the protection of individuals who are parties to cases in court. Court files can contain very private emotional, financial, and psychological documents, as well as identifying information such as drivers license numbers, social security numbers, and addresses of many of the people who are party or witness to a civil or criminal case.

■ When the General Assembly wishes to address and resolve that balance, its specific intent clearly governs—as evidenced by mandates such as the requirement that the court registry of actions, the judgment record, and records of official actions in criminal cases be made public, and the proscription against release of juvenile records.

■ When the General Assembly has not chosen to act with specificity, court rules and procedures govern, and it rests with the court either on a generalized or a specific basis to balance the competing interests.

### IV.

This court has concluded that the release of bulk data generated from computerized record systems is inappropriate at present—even when information that is specifically protected by statute is deleted from that data. The questions presented by the certiorari issues relate to whether we had the authority so to conclude, and whether either CJD 98–05 or the Rule operated as an exercise of that authority.

We here conclude that we may exercise our discretion to limit access to computer-generated court records in a reasonable manner, either on a request-by-request basis or on a more general basis, and that either CJD 98–05 or the Rule serves that function.

### A.

Release of the bulk data to BIS began in 1992 and ceased in 1997, with some interruptions during that period. Following the entry of a court order at the trial court level in September, 1997, delivery continued for an additional twenty months.

Between 1992 and 1998, the operative rules governing release of court records were those set forth in the statutes discussed above, together with one additional court rule.

■ C.R.C.P. 121, adopted in 1988, creates a presumption that court files will be open to the public unless a court order provides otherwise. *See Anderson v. Home Ins. Co.*, 924 P.2d 1123, 1126 (Colo.App.1996). Section 1–5 of that rule provides that "[u]pon motion by any party named in any civil action, the court may limit access to court files. The order of limitation shall specify the nature of the limitation, the duration of the limitation, and the reason for limitation." C.R.C.P. 121, § 1–5(1). The Committee Comment to the Rule clarifies that

> [t]his Practice Standard was made necessary by lack of uniformity throughout the districts concerning access to court files. Some districts permitted free access after service of process was obtained. Others, particularly in malpractice or domestic relations cases, almost routinely prohibited access to court file information. The committee deemed it preferable to have machinery available for limitation in an appropriate case, but also a means for other entities having interest in the litigation, including the media, to have access.

C.R.C.P. 121 cmt. (1999).

■ C.R.C.P. 121 clearly pertains to individual case files accessible to the public upon request for inspection absent a court order to the contrary. It makes no mention of bulk data or computer-generated data. Nothing in our holding today is intended to undermine the general premise that individual case files are open to public inspection upon request.

Rather, we are dealing here with requests for bulk data—which, in our view, raise very different questions. Whether bulk data

should be released and to whom is a matter of important policy that necessarily involves the balancing of individual privacy concerns, public safety, and the public interest in fair and just operation of the court system.[8] A conclusion that those decisions should be made on an ad hoc basis in light of the nature of the request and the proposed use of the information is not an abuse of the discretion afforded to the supreme court or, through the supreme court, to the Chief Justice.

As the California Court of Appeal noted in denying a demand for release of a computer-generated criminal history record:

> There is a qualitative difference between obtaining information from a specific docket or on a specified individual, and obtaining docket information on every person against whom criminal charges are pending in the municipal court. If the information were not compiled in [the computer-generated record], respondent would have no pecuniary motive (and presumably no interest) in obtaining it. It is the aggregate nature of the information which makes it valuable to respondent; it is that same quality which makes its dissemination constitutionally dangerous.

*Westbrook v. County of Los Angeles*, 27 Cal. App.4th 157, 32 Cal.Rptr.2d 382, 387 (1994).

In *Westbrook*, the California Court of Appeal declined to order a municipal court to release its computer-generated court records. *See id.* at 383. Even though the respondent municipal court was deemed to be a criminal justice agency for purposes of the relevant statute, the court of appeal denied the request for release of the master record. *See id.* That court concluded that the records were compiled without the consent of the subjects, and that the California constitutional right to privacy prevented their dissemination in a computerized form. *See id.* at 387. That court stated:

> If entities such as respondent are provided with periodic copies of [the comput-

er-generated data], or any part thereof which includes the identity of the defendant and the charges filed against the defendant, the potential for misuse of the information is obvious. If, for example, the court ordered a record maintained by a criminal justice agency to be sealed or destroyed because a defendant had been found to be factually innocent of the charges, the information would still be available for sale by respondent. Or, to cite another example, if a defendant was granted statutory diversion, this information would be available to the public from respondent even though it could not be obtained from the California Department of Justice. The only control on access to the information in respondent's possession would be the price he places on it.

*Id.* at 387–88 (citations omitted).

In 1998, when the court became aware of the issues concerning bulk data, Chief Justice Mullarkey issued CJD 98–05. That CJD reasserted that it was the policy of the courts that any materials associated with court files that are not declared confidential or private by order of court or statute shall be open to the public for reasonable inspection. However, CJD 98–05 also announced that the release of electronic data was to be addressed on a request-by-request basis by the Public Access Committee, subject to certain guidelines and proscriptions. For example, CJD 98–05 provided that if any bulk data were released, the release was not to contain social security numbers of individuals, information related to victims of crime, probation files, or financial files.

BIS argues, and the court of appeals agreed, that CJD 98–05 was of no effect because it was not an order or rule of this court. We disagree.

■■■ The Chief Justice is the executive head of the judicial system. *See* Colo. Const. art. VI, § 5(2). We previously have recognized that the Chief Justice implements her administrative authority by means of Chief

---

**8.** The United States Supreme Court has opined that the purpose of the federal Freedom of Information Act is " 'to open agency action to the light of public scrutiny,' " not to disclose information about private citizens. *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 772, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989) (quoting *Department of the Air Force v. Rose,* 425 U.S. 352, 372, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976)).

Justice Directives, under the supreme court's general superintending power over the court system. *See Bye v. District Court*, 701 P.2d 56, 59 (Colo.1985).

In *Bye*, we stated that "Chief Justice Directives ... are policy statements promulgated pursuant to this court's general power to administer the Colorado judicial system." *Id.* Similarly, in *Pena v. District Court*, 681 P.2d 953 (Colo.1984), we recognized the basis and enforceability of Chief Justice Directives.

Most recently, in *Yeager v. Quinn*, 767 P.2d 766 (Colo.App.1988), the court of appeals addressed a case in which Boulder County Court judges sought a declaratory judgment as to the validity of a Chief Justice Directive providing for the replacement of court reporters by electronic recording machines. A statute provided that judges could elect to use court reporters. *See Yeager*, 767 P.2d at 767. The court of appeals concluded that "CJD 87–2 does not conflict with any legislative or constitutional policy and is entirely concerned with the orderly dispatch of county court business," and that Chief Justice Directives are policy statements promulgated pursuant to the supreme court's general power to administer the system. *Id.* at 768.

There is no statute directing the release of the bulk records at issue. Every statute that even arguably [9] applies to these records contains caveats such as:

- Inspection may be denied on grounds that it would be contrary to the public interest. *See* § 24–72–305(5).
- Inspection shall be denied if prohibited by rules promulgated by the supreme court or by the order of any court. *See* § 24–72–305(1)(b).
- Such inspection is prohibited by rules promulgated by the supreme court or by the order of any court. *See* § 24–72–204(1)(c).

We conclude that it rests within the authority of the Chief Justice, acting by Chief Justice Directive, to direct and control the release of computer-generated bulk data containing court records. The Chief Justice Directive represents an expression of Judicial Branch policy, to be given full force and effect in matters of court administration.

In light of our conclusion that the Chief Justice is entitled to exercise her authority through Chief Justice Directives, it goes without saying that the court may similarly adopt a particularized Rule such as Rule Change # 1999(3) limiting and directing any release of bulk computerized data.

### B.

The last question on certiorari calls upon us to determine whether the Public Records Act mandates that a custodian of records manipulate a record or electronic data in order to delete any confidential information in response to a request for inspection.

Initially, in addressing this question, we restate that we have concluded that the courts are not included as public agencies for all purposes under the Public Records Act. Therefore, we cannot answer the broad question of whether there is ever an implied duty under the Public Records Act to manipulate data so as to permit release of that data to the public.

Clearly, however, the courts are criminal justice agencies under the Criminal Justice Records Act and have certain duties to provide public access under that Act. Hence, the question could be reframed to ask whether criminal justice agencies must manipulate data upon request for inspection. We answer that question in the negative.

In *Sargent School District No. RE–33J v. Western Services, Inc.*, 751 P.2d 56 (Colo. 1988), we concluded that the Colorado Public Records Act does not contain an implied duty to manipulate data to extract exempt information so as to release the balance of the data. In that case, the issue was whether a school district was required to alter a document containing scholastic testing data, and substitute ethnic origin for the names of the students to preserve anonymity. *See id.* at 57–58. This court concluded that the specific provisions of the Act prohibiting disclosure of

9. For purposes of this particular itemized statutory list, we include the Public Records Act itself, although we have previously determined that it is of limited application to the courts.

scholastic achievement data on individual persons governed, and that the custodian of records had no duty to delete the exempt data, rearrange the scores, provide an ethnic code, and release the data. *See id.* at 61. We also reiterated the premise that we viewed the Act as calling upon courts to "'weigh whether disclosure would be contrary to the public interest.'" *Id.* at 58 (quoting *Martinelli v. District Court,* 199 Colo. 163, 177, 612 P.2d 1083, 1093 (1980)).

A number of courts around the nation share our view that custodians of computerized public records need not manipulate that data in order to create a new record upon request of a member of the public. For example, the New York Court of Appeals concluded that a public medical facility did not need to create a "sanitized" version of certain computerized medical records upon request under the New York Freedom of Information Law. *See Short v. Board of Managers of the Nassau County Med. Ctr.,* 57 N.Y.2d 399, 456 N.Y.S.2d 724, 442 N.E.2d 1235, 1238 (1982). Similarly, the Supreme Court of Ohio held that the State Teachers Retirement System was not required by the Ohio Public Records Act to create a new document by searching for and compiling information from its existing records upon request. *See State ex rel. Kerner v. State Teachers Retirement Bd.,* 82 Ohio St.3d 273, 695 N.E.2d 256, 258 (1998). The court stated: "In order to create the requested records, the board would have had to reprogram its computer system. Therefore, the board had no duty to provide access to the requested records." *Id.; see also Westbrook,* 32 Cal.Rptr.2d at 383 (concluding that the master criminal justice record should only be disseminated as provided by statute).[10]

We conclude that the courts do not have an implied duty to manipulate computer-gener-

ated data under the Criminal Justice Records Act in order to create a new document solely for purposes of disclosure.

## V.

We therefore hold that the courts are not public agencies for purposes of general application of the Public Records Act; that absent statutory mandate dealing with particular court records, such as records of official action in criminal cases, the courts themselves retain authority over the dissemination of court records. The Chief Justice is the executive head of the Colorado Judicial Branch, and her exercise of authority by way of Chief Justice Directive is controlling. Accordingly, the judgment of the court of appeals is reversed, and the declaratory relief sought by BIS is denied.

Justice MARTINEZ does not participate.

---

**10.** *But see* 5 U.S.C. § 552(b) (1994) (requiring that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt"); *Family Life League v. Department of Pub. Aid,* 112 Ill.2d 449, 98 Ill.Dec. 33, 493 N.E.2d 1054 (1986) (holding that the spirit of Illinois's Freedom of Information Act required the agency to create a special program to delete confidential information from the abortion services records for disclosure to the public); *State ex rel. Stephan v. Harder,* 230 Kan. 573, 641 P.2d 366 (1982) (finding that the Kansas public records inspection act imposed an implied duty upon an agency to delete confidential and nondisclosable information related to abortion services from that which may be disclosed); *Newberry Publ'g Co. v. Newberry County Comm'n on Alcohol & Drug Abuse,* 308 S.C. 352, 417 S.E.2d 870 (1992) (concluding that a South Carolina statute requires the segregation of exempt and nonexempt material in criminal investigative reports so that the information can be made available to the public).